Case number 22-1809 from Eastern Arkansas, Gregory Holt et al. v. Dexter Payne et al. Good morning, Your Honor, and may it please the Court. At each step of RLUIPA's analysis, the District Court erred. The District Court erred by dissecting our clients' religious beliefs and practices, applying the rigorous analysis that RLUIPA requires, not to the government's assertions about its security rationale, but to the consistency and particularities of our clients' religious beliefs. And the Court erred by accepting at face value the prison's excuses. The reasons that the prisons offered to justify not accommodating our plaintiffs were the run-of-the-mill administrative excuses that have existed since government has been here. When it comes to Jummah, our clients' Muslims believe it's their obligation to gather for a weekly prayer that Islam requires they offer together. It's a prayer Gregory Holt, Rodney Martin, Wade Stewart believe, like other Muslims, they must perform behind a Muslim prayer leader and alongside other Muslims. That's their belief. That's what they stated as their belief in the testimony. And what the District Court got wrong is that it set aside that belief and said instead that it's all, generally speaking, the same. That the Muslims, the folks that belong to the Nation of Islam, and the five percenters that comprise the Nation of Gods and Earths, that all those groups are pretty much the same in the eyes of the prison. But if this Court were to attend that Friday service, it would hear people say, God is great, to the Muslims, to our clients, to the folks that belong to the Nation of Islam, Allah is a reference to a person, Master Fahd Muhammad. And for five percenters, Allah is an acronym, standing for arm, leg, leg, arm, head, a reference to the person saying it. These are differences. These are real differences. And whatever the District Court thought of the differences, the significance of them, this Court, as the District Court should have done, is limited to assessing whether those beliefs are honestly held. Why aren't the security concerns a real issue? And I say that because, and maybe you draw the line at a different place, but if there's 500 people in the prison, you obviously can't have 500 separate services. That just doesn't work. You've got to draw a line somewhere. And so why don't the security concerns here make the line drawn exactly right, potentially? The line, well, that's just not this case. This case is seeking a separate service for Muslims, similar to the separate service for Muslims in the Bureau of Prisons, where prisons and jails all across the country confront this issue. And the way that they generally handle it is by allowing folks that are incarcerated to identify as Muslim, as belonging to the nation of Islam. And that's the sensible, obvious option for them here. And all the security concerns ultimately relate to staffing shortages. And it's telling that those staffing shortages were asserted before the pandemic, they were asserted during the pandemic, and they were asserted today. And they haven't changed in their particularities. And so what RLUIPA requires, what Holt v. Hobbs set out, is for this court to really interrogate the security rationale that the prisons are offering. And here, look at the KUFI, the head covering. In ADC prisons today, there are all sorts of authorized head coverings, medical toboggans, winter caps. And it just happens to be the case that when it comes to KUFIs outside of the cell, that's a bridge too far and a step too much that ADC is not willing to take. As I reviewed the record, it appears to me that at least one of your clients stated that it would be acceptable to have the same exact service with the same leader, but with a screen separating the different groups. Is that a misunderstanding of the characterization of the testimony? Yes, Your Honor. The prayer does need to be separate. The idea of a screen in the separate room is aimed at addressing the issue that the ADC asserts, that, well, if there's two separate services, we'll need additional guards. Well, the screen solves that problem by putting a screen between the Muslims and the NOI folks. You just need one guard, and you could do two separate services in the same place. So it's still two separate services, right? Because I couldn't tell from the record whether or not it was possible that they could pray together, that they could have some acceptable person to all three groups who could lead the service. No, Your Honor. Our clients are seeking separate services for the Muslims' view, the combination that is being imposed on them. They're imposing a religious group that, in our client's mind, is further away from them than Christians or Jews. I'm going to stop now to honor my fellow. You may. Ms. Bortnick. May it please the Court, Yael Bortnick for the United States. And I would like to address three errors in the district court's legal analysis under ALUPA. First, with respect to sincerity, the district court erred by focusing, instead of on demeanor or the tone, on erroneous applications of the law. It required a doctrinal justification, and it required perfect adherence, neither of which is allowable under ALUPA. Second, with respect to the substantial burden, the ALUPA analysis requires a practice-specific analysis, and the district court here erred by instead reframing the nature of the relief the plaintiffs were requesting. And finally, with respect to the least restrictive means analysis, the district court erred by failing to apply rigorously ALUPA's demanding standard. And I'd like to pick up there with Judge Stross's question about security concerns. It is possible that there would be a case where it would break the camel's back and there really couldn't be more services, but that's not what the district court held here. Here, the district court simply said in a single sentence that there were no least restrictive means due to staffing and security, but that's not sufficient under ALUPA. The court has the obligation, as Holtby-Hobbs clarified, to consider whether exceptions are required under the test set forth by Congress. And here there were possible alternatives that the court itself recognized as obvious, such as having two services in the same room simultaneously, and the court failed to address whether that could be a less restrictive alternative. Similarly, the court failed to address whether there were inconsistent or under-inclusive applications of the two policies at issue. Not only do other prison systems allow separate services for traditional Muslims and NOI adherents, as well as allowing kufis to be worn throughout their facilities, there is evidence in the record that ADC itself has made those accommodations in other instances. With respect to prayer services, at at least one facility, ADC has allowed simultaneous services to take place for five different Christian sects, including three within the same location, demonstrating that that may be a less restrictive alternative. So your argument really is that we could decide this based on the least restrictive means analysis. We don't even really have to get into whether or not there could be security concerns that could justify different, you know, for example, holding, you know, 500 different services, maybe the straw, as you say, that broke the camel's back. But here we can just say there were alternatives and that the prison failed to consider them. The United States hasn't disputed that security may be a compelling interest. But even if that is a compelling interest here, the court would still need to analyze, as you say, whether there is a less restrictive alternative. Here, even the district court recognized that there may be obvious alternatives, but its opinion failed to address those. And so the United States position is that further analysis is necessary. If there are no further questions on less restrictive means, turning to sincerity, the district court erred on two ways. It required a doctrinal justification. It faulted the plaintiffs for failing to cite the Koran as the source of their belief in wearing a kufi. But this court has made clear multiple times that no doctrinal justification is necessary. And even if one were, the plaintiffs cited the Hadith, another source that the Supreme Court has recognized, is widely followed by observant Muslims. Similarly, the district court erred in requiring perfect adherence. Even the most sincere practitioner may stray from time to time, and the district court's opinion seemed to require something differently. It also is inconsistent in its application. It faulted Mr. Holt for never attending a Juma service in the last five years, although that was entirely consistent with his stated beliefs, and at the same time faulted Mr. Martin and Mr. Stewart for attending mixed services. That simply can't be the standard under RLUIPA. With respect to substantial burden, the district court also erred in reframing the nature of what the plaintiffs were seeking. RLUIPA requires a practice-specific analysis, and courts must consider whether government policy is a substantial burden on the individual's sincere belief. Here, rather than address whether the form of the congregation violated or was a substantial burden on the plaintiff's beliefs, the district court reframed the nature of the question and asked whether there was a burden because plaintiffs don't select the text for the prayer or deliver a khutbah. But that's not the relief plaintiffs are seeking. Similarly, with respect to kufis, the district court erred in holding that there is no substantial burden because Mr. Holt can wear his kufi for 22 hours a day, but plaintiffs seek to wear their kufis at all times. Is there any evidence, I was just curious, about other head coverings? You're not co-counsel, but the appellant ended up talking about the fact that other religious headwear, like yarmulkes and things like that. Is there any evidence in the record about how the prison treats those other types of head coverings? For religious head coverings, Your Honor, I believe the record demonstrates that no religious head coverings are allowed formally outside of religious services. Informally, at least with respect to kufis, they may wear them in their cells and sometimes in their barracks. But the policy may still be under-inclusive, given that ADC does, as Mr. Arbas recognized, allow for other caps to be worn in work assignments, in the yard, including summer hats and winter hats. And for medical purposes, hats may be worn at all times with a prescription. The Supreme Court in Holt v. Hobbs very similarly recognized that because ADC allowed for a medical exemption to its grooming policy, that may be evidence that its interest in restricting religious beards might not be as compelling as they assert. The same could be said here. And if there are no further questions, the United States would rest on its briefs. Thank you. Ms. Donovan? Good morning, and may it please the Court. My name is Kate Donovan, and I represent the Arkansas Department of Corrections. The district court correctly applied RELU, but to the declaratory and injunctive relief that the plaintiffs requested in their complaint. In their complaint, the plaintiffs asked for a separate service. The ADC policy provides for a separate service. It simply doesn't allow them to exclude certain parties from their service. The plaintiffs may have a sectarian service, in which they are led by an outside world volunteer, presuming if there is space and a guard available at that time. But that's not what they've asked for. What they've asked the ADC to do was to find Islam in a way that excludes certain groups from attending that service. That non-denominational service is actually controlled by the blue order. The blue order requires the ADC to hold this Jumu'ah prayer service and have it be non-denominational. In addition, the two Sabah's orders define the content of that service. Could they have had their own service in addition to the service that's mandated? Could they have asked for and petitioned for their own service in the sense of excluding people, but with different content? Yes, they could have. The ADC policy allows for sectarian services. It simply requires a free world volunteer to lead the service, presuming that there's a space available at the time and security available. They are, like other Christian groups that are held in the evenings or at other times, they're allowed to have those services, but that's not what the plaintiffs asked for here. What Mr. Holt and Mr. Stewart and Mr. Wade wanted the ADC to do was to find Islam in a way that excluded certain groups from that definition and exclude them from the non-denominational service that was required. It's required under the blue and Sabah's. And ADC has certainly a compelling interest in complying with the orders that it is subject to. Are there Christian services that ever exclude any other Christian sectarian services? No. Because one of the things they've talked about is that there are some institutions that have up to five Christian services and one Islam service, Muslim service. None of the services exclude anyone. People self-identify. And so that was a little bit of the testimony at trial, is that the chaplains take the prisoners at their word whenever their faith is professed. They say, I am a nation of Islam or I am Methodist or whatever the service is. They take it at their word and they go to the services that they say that they wish to attend. And so there was also some testimony at trial that if a person of Jewish faith or Christian faith were to attend the Jumu'ah prayer service, that would not offend the plaintiff's religious beliefs as long as they sat in the back, that they wouldn't in fact be leaving the prayer service. And in fact, at trial, some of the issue was that the problem came when the ADC policy, when they drifted away from what the ADC policy stated, which is there is one Jumu'ah prayer that pick up the prayer services led by a prayer leader who is selected by the Islamic prayer leader and that they stay with the selected text and the kupah. And that really these issues bubbled up when in fact some of the newer chaplains did not understand what was required under the blue order and that they were allowing certain inmates to offer an interpretation through the sermon rather than sticking with what was required under the ADC's very specific Jumu'ah policy. So the district court also got right in finding the fact when it came to whether or not the plaintiff's beliefs were sincerely held. And I understand that the appellant's position is not as really that the court erred there, but I think that the role of the district court here was to look at really the credibility of the plaintiffs as they testified and trialed. And there were some inconsistent testimony. There were some inconsistencies in the ruling. I mean, let's just be perfectly honest. The trial judge at one point says at the end of the hearing, they honestly believe this and this is their honest belief. No one's questioning that. Then we turn around in his written order and he says, you know, they're insincerely held. But there's no analysis of the facts. So we can say there's no credibility determination that's explicitly made that says, I don't find this particular witness lacking in credibility. I mean, isn't it just such a mess? We can't really tell how the judge actually arrived at that conclusion. I think that the court can look at the entire record, but the district court's conclusions in applying the law could have been more specific. Oh, yeah. Could have been more specific. But the district court sat through a three-day hearing on this issue and was very familiar with the issues well available. And the district court makes that clear several times. And I think in some of his statements, it's not necessarily saying that he's reached a conclusion, but at the same time he's voicing his thinking process as he's working through these issues. So at the beginning of the trial, there was some debate about whether or not sincerity was still an issue. And the district court did make it very clear on the record that he intended to hold the plaintiffs and the department to all of their burden of proof. So this is just another one of those cases where the musings of the judge may differ from the rulings, but we should analyze on the rulings and are the findings of fact and the conclusions of law set forth at the end, do they tie sufficiently to the record to be sustainable? That's exactly what I would say, Your Honor. There is a significant record here, and we have a three-day trial. And opposed to, for instance, the Holt v. Hobbs case, which was a three-hour hearing on the preliminary injunction, what we have here was a three-day trial before the court. And we had three witnesses for the plaintiff, and we also had three chaplains who came and testified. And we had the director of the ADC, Dexter Payne, come and testify. And Warden Colclage, who had intimate knowledge of what it is to be able to move prisoners from one area to another to get to Juma Prayer, which has occurred under their faith at this particular time of day. And so it faces some obstacles that the ADC doesn't face when it comes to services that have greater flexibility. Let me ask you this. So I agree with Judge Erickson that the district court could have obviously said, all of these guys aren't credible. Didn't say that. What the district court did say on sincerely held beliefs is sort of prove that there's some place in the doctrine that justifies what you're asking for. And I think that under our case law, that just is not permissible. I mean, you can ask for consistency. You can judge their credibility. But I don't think you can say, show me in the Koran or show me in your texts  And I think that that infects the entire holding on sincerely held views. Tell me why that's wrong. Well, it's one piece of it, as was discussed a little bit. The one piece of the court's analysis is whether or not the plaintiffs could point to particular parts of the Hadith or the Koran and available. And maybe when they're not, it's in the doctrine, is whether or not the plaintiffs have sufficient knowledge of the doctrine and Koran to be able to say that this is, in fact, a sincerely held part of their beliefs. Could have done it a little more neatly. I think that we're saying that that's possible. But if you look at where the sincerely held belief stuff kind of comes from, you go back into the 70s and 80s. There was what the Reverend Clovis Green or whatever that had these claims where he asserted that they religiously held the belief that they needed to watch Monday night football to the conclusion of the game and that they needed to eat steak on Fridays. And guys were able to say whatever that is. Cult doesn't exist outside the prisons. It's not sincerely held, right? But we haven't otherwise gone to people and said, hey, show us in your theology where you're drawing these doctrinal conclusions. I mean, that seems to really start to invade the right of free exercise in a way that we just generally don't in any case. I think the case law here is that they don't have to look to a specific point to some sort of specific Bible verse that would support their belief. But they do have to be able to use that as a piece of being able to determine whether or not that is an honest conviction about their belief. And so it is the way that the court decided, phrased its findings. But there's a lot of evidence in the record for which the court could also say that there was some question about whether or not their beliefs were credible and consistent based upon the conflicting testimony from their deposition testimony, which they were confronted with during their trial. Counsel, do you think that the district court made any of those credibility findings? And I know my colleagues have raised this issue as well, and you have sort of referenced some inconsistencies in testimony and credibility issues. But do we have anything from the district court that actually makes that call? The district court's opinion does not specifically address the credibility of the witnesses on any particular way. What it has is that they just found that it was not sincerely held, and it's phrased more in the general language of Ray Lupa as opposed to. Do you think we can do that? Well, I believe under Rule 52 the court really has, and I think that under reviewing it, the court can look at the entire record that was before the district court and whether or not there are facts that support the district court's finding. So I think that the court should be able to look at the record that was completely before the court and maybe not just the court's one or two sentences on that issue. I wanted to ask you about, to sort of jump ahead, the security, the compelling interest in the security, which I think probably in the abstract is compelling. I mean, we don't want inmates running the prison, so to speak. We need to have security in our prisons. At the same time, the least restrictive means seems like a problem to me, at least with regard to the district court's analysis. For example, the plaintiffs mentioned that they could wear transparent koofies or mesh koofies to take care of the issue with security and hiding things under your headwear. There's obviously a less drastic measure that could be taken, too, where you allow certain prisoners to wear koofies all the time as long as they comply with searches. If they don't comply with searches, then they don't get to wear them outside anymore. I mean, there just seems to me, and then you've got the screen at the services as well, it just seems to me that there's some obvious less restrictive measures that would still satisfy the prison's interest. And I think that in this issue, it's not like they're aware. There are some cases where they're not allowed, whether it's an either or. It's not allowed that the plaintiffs can never wear this sort of hat. It is that they can't wear it outside, as under policy, and they're not allowed to wear it outside of religious service. But as a practice, they are allowed to wear it in their cell or even in the barracks. And so I think that you have to look at the specific facts of this case and whether or not it is the least restrictive means. And I think that also ties in what the testimony at trial is, and at the time that this case was trialed, is that staffing was down 70% at the ADC. And we know that the resources at the ADC is always the refrain that we don't have sufficient people, we don't have sufficient time to be able to conduct these searches. But my understanding is, even for like outside time, that the people who were outside were able to wear headwear outside. They just had to go through a search or whatever before they were – so it seems to me that it doesn't make sense, or at least it's not the least restrictive means, for there to be a limit in saying, but not koofies, and not other religious headwear. I can't reconcile that. Well, I think that it is always an issue of whether or not – the ADC policy for whether it is a work hat or other hats, those are tied to specific duties, specific work duties, and they're a part of that. Each increment in which the court allows plaintiffs to have, wear either a yarmulke or other religious headdress, is part of that spiraling burden upon the state to be able to meet those needs. And that ties back into the ADC's compelling interest in meeting – that what the court, what the district court was looking at, is the ADC has a compelling interest in meeting all of the needs that the inmates have, and that includes getting them to medical appointments, doctor's appointments, providing them, making sure that they get their meals, and those sorts of things. And when staffing is 70% down, this ADC was very much struggling to be able to reach those minimum requirements. That does raise an interesting point that I've always wondered about this area of the law, though, is what do you do with that? Is the rule different when staffing is normal or staffing is up and anyone can wear a headgear, but sorry, you can't do it when we've got staffing down. Your religion has to take a backseat to our security concerns. I mean, is that sort of where the law has taken us? I think that the issue is the balancing test that the Congress gave us under Ray Lupa, and that each of these cases is very much tied to the specific facts that were presented at the time. This was a case for asking for prospective injunctive relief, and the court had to make that decision based upon the facts that were presented at trial. And, you know, Dexter Payne and Warren Colclasure had between them something like close to 75 years of experience at the ADC, and they had never seen staffing at this level. Well, and what's odd about this is suppose that the plaintiffs, in your view, come back in two years or three years, and staffing levels are back up. I don't know if they will be, but let's presume they are. Do they win then, but they lose now in the ADC's view? It will be a different argument. Is that right? So that whether or not those balancing tests weigh and went in the favor of the plaintiff or the defendant. And so we ask that the court perform the district court's order in all respects. Thank you. Mr. Roberts. The last time Gregory Hull and ADC were before this court, ADC told this court, as it did the court below, that it was a quarter inch, half inch of facial hair that was the line between civilization and chaos. And now they've taken out facial hair, and they've substituted in a mesh head covering, no different from a security perspective, than the medical toboggans that they issue via prescriptions, by individualized, considered prescriptions. And this, RLUIPA doesn't allow. And in exchange, the ADC is inviting this court to wade into theological matters. Yes, the ADC is taking a position on what is Islam and what isn't, who is Muslim and who isn't. What do we do? I want to go to the services, because there was one point made by ADC that is different in the framing of the case. They say the plaintiffs weren't asking for their own services, and had they been asking for their own services without, you know, you can't exclude anybody. So without the ability to exclude anybody, we would have given it to them. We would have put up the screen or whatever, allowed different services, just that everybody could come. That's not accurate, Your Honor. Our colleagues on the other side said that people self-identify, and what our clients are asking for is the ability to self-identify as Muslim and to attend a service of Muslims. And that is the reasonable, kind of typical expectation of a religious adherent, that they're going to worship alongside those that believe as they do. That in the process of praying, in the call and response of a leader and those following them in prayer, that's substantive. That may not have a meaning to the district court. It may not have a meaning to the prisons. Let me ask you this, because I don't know that you're precisely answering my question. So suppose you get this. Suppose you get the separate services, and then the prison comes back to you and says you cannot exclude Nation of Islam people. You can have the service you want, but if the Nation of Islam folks come in, you've got to let them in. What would be your position? Our position would be that people should go to the services that they identify at. If they want to attend and watch, that would be fine, but the Muslims should be able to identify and have a Muslim service. The NOI folks should be able to identify as NOI and attend a service for them as well, which is exactly what happens in the federal context. Thank you, Your Honor. Thank you. The case is submitted. I want to thank you for the briefing and the arguments. It's been very helpful. The clerk may call the next case.